MEMORANDUM OPINION AND ORDER
 

 ALBRITTON, Chief Judge.
 

 I.
 
 INTRODUCTION
 

 This cause is before the court on cross-motions for summary judgment. The plaintiffs in this action, Phillip Groover, Harry Vogler, Leon Stancil, Wyatt Lee Potts, Jr., Norman Shockley, Jr., Marline Sykes, Roy E. Plott, John Smith, and Deborah Lea, together with the conditionally certified class they represent (collectively “Plaintiffs”), filed a Motion for Partial Summary Judgment on July 28, 1999 (doc. # 35). On August 19,1998, the Defendant, Michelin North America, Inc., (“Michelin”), filed a Brief in Opposition to the Plaintiffs’ Motion for Partial Summary Judgment and in Support of Defendant’s Cross-Motion for Summary Judgment, and filed, in conjunction with its Brief, a Motion for Summary Judgment on all counts alleged in the complaint (doc. # 39).
 

 Plaintiffs initiated this action alleging violations of § 301 of the Labor Management Relations Act of 1947 (“LMRA”) for breach of a collective bargaining agreement, and § 502(a)(3) and 510 of the Employee Retirement Income Security Act of 1974, (“ERISA”) for interference with protected rights under Michelin’s pension and insurance plan. Specifically, Plaintiffs allege that Michelin North America made unilateral changes to the health insurance benefits supplied to hourly retirees in violation of applicable Pension and Insurance Agreements (“P & I Agreements”) that Plaintiffs claim provided union retirees nonforfeitable rights to minimum levels of lifetime insurance benefits.
 

 For the reasons discussed below, both Motions are due to be DENIED.
 

 II.
 
 SUMMARY JUDGMENT
 
 „
 
 STANDARD
 

 Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of
 
 *1239
 
 law.”
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 817, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 

 The party asking for summary judgment “always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ‘pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,’ which it believes demonstrate the absence of a genuine issue of material fact.”
 
 Id.
 
 at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.
 
 Id.
 
 at 322-324, 106 S.Ct. 2548.
 

 Once the moving party has met its burden, Rule 56(e) “requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the ‘depositions, answers to interrogatories, and admissions on file,’ designate ‘specific facts showing that there is a genuine issue for trial.’ ”
 
 Id.
 
 at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party “must do more than show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita, Elec. Indus. Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the non-movant’s response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant.
 
 See Peppers v. Coates,
 
 887 F.2d 1493 (11th Cir.1989). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.
 
 Anderson v. Liberty Lobby,
 
 477 U.S. 242, 255,106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 

 After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Giv.P. 56(c).
 

 III.
 
 FACTS
 

 The submissions of the parties establish the following facts:
 

 Michelin owns and operates tire manufacturing facilities in Opelika, Alabama; Tuscaloosa, Alabama; and Fort Wayne, Indiana. Michelin merged with Uniroyal Goodrich Tire Company in 1990. Uniroyal Goodrich was the product of a merger between Uniroyal, Inc. and BF Goodrich Company in the 1980’s. In addition to the active manufacturing facilities, Michelin or its predecessors operated tire manufacturing plants which are now closed in Eau Claire, Wisconsin; Akron, Ohio; Miami, Oklahoma; Oaks, Pennsylvania; Chicopee, Massachusetts; Indianapolis, Indiana; and Los Angeles, California. Wage employees at these facilities are or were members of a collective bargaining group represented by the International Union of the United Steel Workers of America AFL — CIO— CLC, which recently merged with the International Union of the United Rubber, Cork, Linoleum and Plastic Workers of America AFL — CIO—CLC. Michelin also operated textile manufacturing plants in Hogansville, Georgia; Shelbyville, Tennessee; and Exeter, Pennsylvania. A different union represented employees at those facilities.
 

 A series of P & I Agreements, which were the subject of collective bargaining, describe the exact nature of the welfare benefit package agreed upon by the parties. Plaintiffs assert that the P & I Agreements provide medical benefits for active employees and those who retire during the life of the relevant P & I Agreement. In this case, Plaintiffs contend that, upon their retirement, their medical benefits vested under the applicable P & I Agreement and could not be subsequently lowered or modified. They assert that nearly identical language from various P & I Agreements indicates an unambiguous
 
 *1240
 
 intent to vest. Plaintiffs have submitted to the court fourteen P
 
 &
 
 I Agreements effective prior to the 1994 P & I Agreement which allegedly reduced medical benefits. All of the Agreements contain similar provisions affording medical benefits to retirees and surviving spouses of retirees. For example, the 1991 P & I Agreement states, “Employees who retire and who are eligible under the 1991 Pension and Insurance Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits described in this Article____ The surviving spouse of an Employee who is retired by the Company on or after the effective date of this Agreement shall continue to be eligible to receive such benefits to the earlier of the date of death or remarriage.... ” May 3, 1991 Uniroyal Goodrich P
 
 &
 
 I Agreement, at 219-20.
 

 Plaintiffs contend that the phrase “shall receive the benefits described,” applicable to retirees, and the phrase “shall continue to be eligible to receive such benefits,” applicable to surviving spouses of retirees, unambiguously indicate that the medical benefits are vested. The 1988 Uniroyal Goodrich P & I Agreement and the various B.F. Goodrich P
 
 &
 
 I Agreements which the Plaintiffs submitted to this court contain identical phrases. The P
 
 &
 
 I Agreements entered into by Uniroyal, Inc., which the Plaintiffs submitted, contain an identical phrase applicable to surviving spouses of retirees, and provide that retirees “shall continue to receive” the benefits described in the relevant Agreement.
 

 The disputed changes which serve as the factual basis of the Plaintiffs’ claims were implemented under the P
 
 &
 
 I Agreements dated May 4, 1994 and June 12, 1997. Among the alleged reduction in benefits are an increased deductible for retirees eligible for Medicare, a cap on the level of reimbursement the company will provide to retirees for Medicare Part B premiums, an increased co-pay for prescriptions filled locally, a requirement that purchasers of name-brand prescription drugs pay the difference in cost between the name-brand and its generic counterpart, a $100 deductible for chiropractor visits, and a limitation of benefits to $25 per chiropractor visit.
 
 [1]
 

 Plaintiffs brought this action on behalf themselves and all other similarly situated retirees seeking to recover damages and to enjoin Michelin from reducing retiree benefits below the benefit levels in effect during the tenancy of the P & I Agreement when a union retiree first retired. Plaintiffs assert that the P & I Agreement in effect at the time a union retiree retired vested those retirees with a minimum level of welfare benefits that cannot subsequently be reduced without consent.
 

 On June 24, 1999, this court issued a memorandum opinion and order conditionally certifying a class of plaintiffs composed of:
 

 [a]ll persons who were wage employees of Michelin North America, Inc., or its predecessors, who are retired and whose medical benefits were reduced by application of collective bargaining agreements dated May 4, 1994, and June 12, 1997, and the surviving spouses or dependents of such persons who are beneficiaries of the medical benefits plans provided by Michelin.
 

 Groover v. Michelin,
 
 187 F.R.D. 662, 671 (M.D.Ala.1999).
 

 Cross-motions for summary judgment followed with both Michelin and Plaintiffs arguing that the contract is unambiguous. Plaintiffs’ primary contention on summary judgment is that the P
 
 &
 
 I Agreements are unambiguous and vest retirees with medical benefits. Michelin’s primary contention on summary judgment is that the P & I Agreements are unambiguous and do not vest retirees with welfare benefits.
 

 
 *1241
 
 IV.
 
 DISCUSSION
 

 When Congress passed ERISA it left retirement welfare plans free of most of the restrictions that it imposed upon retirement pension plans.
 
 Compare
 
 29 U.S.C. § 1051(1)
 
 with
 
 29 U.S.C. § 1053(a). Absent these statutory strictures, there are no statutory prohibitions preventing employers from modifying or terminating retiree welfare benefits. “Unlike pension benefits, which are subject to stringent vesting requirements under ERISA, welfare benefits, such as health care insurance, are vested only if so provided by contract.”
 
 International Ass’n of Machinists v. Masonite Corp.,
 
 122 F.3d 228, 231 (5th Cir.1997). ERISA “does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.”
 
 Curtiss-Wright v. Schoonejongen,
 
 514 U.S. 73, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). Thus, whether a collective bargaining agreement vests health insurance benefits in retired employees is a question of contract interpretation.
 

 A.
 
 Contract Interpretation under the LMRA
 

 Plaintiffs brought this action under § 301(a) of the LMRA for breach of contract. “Federal substantive law governs the interpretation and enforcement of contracts covered by § 301(a) of the LMRA, § 29 U.S.C. § 185(a) (1988),” and the law of contracts that is applied in suits under the LMRA to enforce collective bargaining agreements is federal common law, rather than the law of the state where the agreement is signed or performed, or of any other state.
 
 Stewart v. KHD Deutz of America Corp.,
 
 980 F.2d 698, 702, n. 3 (11th Cir.1993). Federal courts may, however, apply “traditional rules for contractual interpretation ... as long as their application is consistent with federal labor policy.”
 
 Id.
 
 at 702
 
 (quoting International Union, UAW v. Yard- Man, Inc.,
 
 716 F.2d 1476, 1479 (6th Cir.1983),
 
 cert. denied,
 
 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984)).
 

 There is no federal labor policy that favors the creation of nonforfeitable rights to any term subject to collective bargaining.
 
 See United Mine Workers v. Robinson,
 
 455 U.S. 562, 575, 102 S.Ct. 1226, 71 L.Ed.2d 419 (“when neither the collective bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of the collective bargaining contract”);
 
 Stewart,
 
 980 F.2d at 702 (“federal labor policy neither favors nor disfavors the vesting of retiree benefits”). Therefore, any argument that the retirees’ benefits are vested and, hence, survive beyond the term of the labor agreement, must find its genesis in the labor contract itself.
 
 See John Wiley & Sons v. Livingston,
 
 376 U.S. 543, 555, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).
 

 When welfare benefit rights are provided pursuant to a collective bargaining agreement, they may be either “vested” or “nonvested.” Vested retirement welfare benefits are those that are intended to survive the expiration of the underlying agreement and cannot be unilaterally terminated or modified.
 
 See Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,
 
 404 U.S. 157, 181 n. 9, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (“under established contract principles, vested retirement rights may not be altered without ... [the retiree’s] consent”). Although labor contracts normally expire on a periodic basis, the parties may agree that rights conferred by a labor contract survive its duration. Employers may agree to relinquish their right to unilaterally terminate those benefits and provide for lifetime vesting.
 
 See Inter-Modal Rail Employees Ass’n v. Atchison, Topeka & Santa Fe Ry. Co.,
 
 520 U.S. 510, 515, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997) (noting that employer may “contractually cede [ ] its freedom” not to vest benefits);
 
 see also, First National Mainte
 
 
 *1242
 

 nance Corp. v. NLRB,
 
 452 U.S. 666, 101 S.Ct. 2578, 69 L.Ed.2d 318 (1981) (same).
 

 Nonvested welfare benefits are subject to termination at the expiration of the underlying agreement. Because retirees are not employees or a bargaining unit for the purposes of the National Labor Relations Act,- the negotiation of their benefits is only a permissive — not a mandatory — subject of bargaining.
 
 Pittsburgh Plate Glass,
 
 404 U.S. at 185, 92 S.Ct. 383. Thus, union retirees who receive nonvested welfare benefits under one collective bargaining agreement are not necessarily guaranteed the same, level of benefits or any benefits at all under subsequent labor contracts.
 
 See United Steelworkers of America v. Connors Steel Co.,
 
 855 F.2d 1499 (11th Cir.1988).
 

 To reach a trier of fact on the issue of whether a retiree has received vested retirement benefits, a retiree does not have to point to unambiguous language in the labor contract to support a claim. “It is enough to point to written language capable of reasonably being interpreted as creating a promise on the part of the employer to vest the recipients benefits.”
 
 American Federation of Grain Millers v. Int’l Mutlifoods Corp.,
 
 116 F.3d 976, 980 (2d Cir.1997).
 

 B.
 
 The Contracts
 

 Plaintiffs have moved for summary judgment claiming that the P & I Agreements unambiguously vest retirees with retirement welfare benefits. Michelin has also moved for summary judgment claiming that the P & I Agreements unambiguously do not vest retirement welfare benefits. For the reasons discussed below, the court disagrees with both Michelin and Plaintiffs and finds that the P
 
 &
 
 I Agreements are ambiguous as to the parties’ intent to vest welfare benefits.
 

 The parties’ constructions of the P & I Agreement center around (1) the meaning of the word “shall” in the clause granting retirees’ medical benefits, (2) the language granting a surviving spouse of a retired employee continuing welfare benefits in the event of the retiree’s death, (3) the fact that eligibility for a pension, which is vested under ERISA, is a criterion for being eligible for welfare benefits, and (4) the meaning and effect of the general duration clause upon the retirement welfare benefits.
 

 1.
 
 Paragraph 6.1U
 

 The Plaintiffs have pointed the court to paragraph 6.14 of the applicable Agreements, which the parties agree are identical in all of the Agreements.
 

 Paragraph 6.14 of the 1991 P & I Agreement provides:
 

 Employees who retire and who are eligible under the 1991 Pension and Insurance Agreement for a Pension (other than a deferred vested pension),
 
 shall receive the benefits described
 
 in this Article, provided, however, that each former Employee eligible for a Deferred Vested Pension whose employment with the Company is terminated at or after his attainment of the age of sixty (60) years shall also receive such benefits as of the latter of his normal Retirement Date or the first day of the month in which he receives a Deferred Vested Pension.
 

 Id.
 
 (emphasis added). All other agreements contain identical language.
 
 [2]
 

 Plaintiffs assert that the use of the word “shall” is sufficient to evince an intent to vest.
 
 Pl.Br.
 
 at 8. For this proposition Plaintiffs argue that the word “ ‘shall’ has two possible meanings, both suggesting the permanence of the right. To the extent that it is compulsory, it compels that those who are eligible also must be eligible for medical insurance. To the extent that
 
 *1243
 
 the term expresses a future tense, it suggests long term entitlement.”
 
 Id.
 

 Of course, the mere fact that the word “shall” can indicate some sense of futurity of obligation or compulsion to act does not, by itself, unambiguously render infinite the obligation so indicated. The use of the word “shall” is equally consistent with the more common understanding that the word implies. For example,
 
 Webster’s Dictionary
 
 contains the following explanation:
 

 I “shall go” implies nearly a simple futurity; more exactly, a foretelling or an expectation of my going, in which, naturally enough, a certain degree of plan or intention may be included; emphasize the shall, and the event is described as certain to occur, and the expression approximates in meaning to our emphatic “I will go.”
 

 Webster’s Revised Unabridged Dictionary
 
 (1996). Accordingly, and contrary to Plaintiffs’ assertions, the word “shall” does not necessarily “indicate the permanence of the right.” It would have been perfectly consistent with the English language and the rules of grammar to have written the contract to say either (1) “Eligible retirees shall receive welfare benefits for the rest of their lives,” or (2) “Eligible retirees shall receive welfare benefits for the duration of this contract.” Although Plaintiffs urge the court to adopt the former, the contract as written is also consistent with the latter interpretation.
 

 Moreover, as the passage from
 
 Webster’s
 
 suggests, the use of the word “shall” in this situation probably indicates the degree of certainty with which the conferring language operates. As captured in the phrase, “I shall go,” the inclusion of the word “shall” is indicative of the intent to do something and not, necessarily, reflective of its duration. Thus, Plaintiffs’ reliance on the word “shall” as indicative of the permanence of the welfare rights conferred under the applicable P & I Agreement is misplaced.
 

 The court’s reading of the above provision is buttressed by consideration of the way in which the word “shall” is used throughout the agreement. The provision in question, paragraph 6.14, is the portion of the 1991 Agreement that confers welfare benefits upon retirees. The use of the word “shall” appears to be the operative or performative word in the conferring language. As noted, Plaintiffs claim that the verb also serves as an indication of the expected duration of the benefit so conferred. However, it is clear that throughout the Agreement the draftsmen chose the word “shall” to indicate obligations due under the contract. One would be hard pressed to find a single example under any of the applicable P & I Agreements submitted to the court where the word “shall” was not used as the operative or performa-tive verb in the Agreement.
 

 The court agrees with the result that other courts have reached when confronted with similar language in welfare benefits contracts; such language was found an insufficient indication of an unambiguous intent to vest welfare benefits.
 
 See, e.g., Joyce v. Curtiss-Wright Corp.,
 
 171 F.3d 130, 134 (2d Cir.1999) (find that phrase “insurance benefits will be provided for employees ... [who become] entitled to receive pension benefits” did not evince an unambiguous intent to vest welfare benefits);
 
 Int’l Union, UAW v. Skinner Engine Co.,
 
 188 F.3d 130, 141 (3d Cir.1999) (finding that phrases like “will continue” and “shall remain” do not unambiguously evince an intent to vest welfare benefits);
 
 Senn v. AMCA Int’l,
 
 No. 87-C-1353, 1989 WL 248487 (E.D.Wis.1989) (denying plaintiffs motion for summary judgment and holding phrase “benefits will continue” ambiguous as to intent of parties to vest welfare benefits).
 

 2.
 
 The Benefits for Surviving Spouses
 

 Plaintiffs also argue that paragraph 6.14(a) of the 1991 Agreement must be read in tandem with paragraph 6.14(b). That paragraph provides that
 

 
 *1244
 
 the surviving spouse of an Employee who is retired by the Company on or after the effective date of this Agreement shall continue to be eligible to receive the benefits to the earlier date of death or remarriage....
 

 Def.Ex. I
 
 at 222 (1991 P
 
 &
 
 I Agreement). Plaintiffs argue that the surviving spouse clause when read together with paragraph 6.14(a) shows that the parties intended welfare benefits to vest under the Agreement. On the Plaintiffs’ construction of the Agreement, the surviving spouse’s benefits, which continue until death or remarriage, evince an intent to confer such benefits for a period of time which is necessarily beyond the duration of the three-year P
 
 &
 
 I Agreement.
 

 Michelin argues that Plaintiffs “overlook a second, more logical reading of the ‘until death or remarriage’ passage: that in the absence of such language, a surviving spouse could not [sic] remarry ‘during the life’ of that same CBA [“collective bargaining agreement”] without causing her medical benefits to be cut off.”
 
 Def.Br.
 
 .at 33. Thus, according to Michelin, the language of paragraph 6.14(b) clearly shows an intent not to vest retiree welfare benefits.
 

 Other courts have hypothesized other potential interpretations of clauses similar to the surviving spouse provisions of 6.14(b).
 
 See Senn,
 
 1989 WL 248487, at *8 (“the parties might have believed that the contract renewals might have renewed as a matter of course, and so, there would have been no danger of a spouse falling between the cracks”). It is not, however, the court’s job to impose a reasonable hypothesis to cure an ambiguity in a contract. More to the point, paragraph 6.14(b) does not render unambiguous the parties’ intent to vest welfare benefits and, hence, the court cannot rewrite the contract to find benefits that may not have been not intended.
 

 Courts which have found language to be unambiguous in the present context have typically been confronted with relatively clear language. For example, both parties have cited the court to
 
 United Steelworkers of America v. Connors Steel Co., 855
 
 F.2d 1499 (11th Cir.1988) for differing propositions of law. That case is a good example of a situation in which the contract granting retiree rights was unambiguous.
 
 Connors Steel,
 
 as well as other cases finding unambiguous contract language, is distinguishable, however, from the one before the court on the same grounds that were pointed out by the Eleventh Circuit in
 
 Stewart:
 

 Connors Steel
 
 also involved a dispute between retirees and an employer concerning whether a contract gave the employer the right to modify benefits being paid to retirees after expiration of the contract. The contract in
 
 Connors Steel,
 
 however, specifically addressed the issue by providing that qualified retirees “ ‘shall not have such coverage terminated or reduced so long as the individual remains retired from the company ... notwithstanding the expiration of this [basic] agreement.’ ” This court concluded that this language unambiguously established that the employer could not modify the retirees’ benefits. The specificity of the contractual language at issue in
 
 Connors Steel
 
 emphasizes the ambiguous nature of the contract before us.
 

 Stewart,
 
 980 F.2d at 698. Those same reasons apply in the case before the court.
 

 3.
 
 The Tie Between Pension Benefits and Retirement Welfare Benefits
 

 Plaintiffs also claim that the use of Pension benefits as a criterion for being eligible for welfare benefits is enough to show that the parties intended to unambiguously vest welfare benefits. Although it is true that retirees under the applicable P & I Agreement have ERISA protections for their pension benefits, the mere limitation of retiree welfare benefits to pensioners does not necessarily lead to the conclusion that welfare benefits were meant to vest alongside those pensions.
 
 See, e.g., Curtiss-Wright Corp.,
 
 171 F.3d at 134.
 
 *1245
 
 This is particularly true considering that Congress explicitly exempted welfare benefits from ERISA’s mandatory vesting rules.
 
 See Schoonejongen,
 
 514 U.S. at 78, 115 S.Ct. 1223.
 

 Michelin asserts that the fact that pension benefits are unaffected by the general duration clause militates against a finding that welfare benefits are similarly vested. Michelin argues that the general duration clause would be superfluous if it did not apply to retiree welfare benefits because it plainly cannot contravene ERISA and terminate vested pension benefits.
 

 The third possibility interjected by Plaintiffs is that the general duration clause cuts off only non-vested benefits, which the Plaintiffs contend is equivalent to a termination of all benefits only for active employees. Accordingly, Plaintiffs argue that all retiree benefits, pension or otherwise, are unaffected by the agreement’s expiration. Both of these arguments, however, beg the question of whether retiree welfare benefits were intended to vest.
 

 At the very least, however, Michelin is correct in pointing out to the court that the effect of the general duration clause is consistent with non-vested retiree welfare benefits. Michelin’s construction of the general duration clause would be a reasonable construction of the agreement. The court also finds, however, that Plaintiffs’ construction of the general duration clause is also reasonable and also is consistent with vested retiree welfare benefits. “A contract is ambiguous when it is reasonably susceptible to more than one interpretation.”
 
 Stewart,
 
 at 701.
 

 4.
 
 The General Duration Clause
 

 Michelin also asserts that paragraph 6.14 should be read in connection with the general duration clause of the P & I Agreements. For example, according to Michelin, the ambiguity found in paragraph 6.14 of the 1991 Agreement, if one exists, can be resolved by reference to the general duration clause found in Article 10 of the 1991 Agreement. Additionally, Michelin asserts that the stated purpose of the P & I Agreements further buttresses its claim that the contract is unambiguous and does not vest welfare benefits. For example, in the 1991 P & I Agreement, the purpose clause provides that “[t]he Pension and Insurance Agreement constitutes a settlement for the duration of this Agreement of all retirement ... benefits.”
 
 Def.Ex. I
 
 at 2. Likewise, the general duration clause provides that “this Agreement shall continue in effect through April 24, 1994____”
 
 Id.
 
 at 1Í 10.4. Accordingly, Michelin asserts that this language unambiguously evinces an intent to limit retiree welfare benefits to the duration of the agreement.
 

 In response, Plaintiffs correctly point out that this language is at best ambiguous as to the intent to vest retirement benefits. Plaintiffs argue that in the articles of the Agreements describing welfare benefits for active employees, the draftsmen chose to include specific limitations on the durations of those benefits notwithstanding the existence of a general duration clause.
 
 [3]
 
 In the article conferring retirement benefits on union employees who retire under a P & I Agreement, for example paragraph 6.14 of the 1991 P & I Agreement, no such limitation is included. According to Plaintiffs, while the duration of any benefits
 
 *1246
 
 that are subject to renegotiation may be tied to the duration of the P
 
 &
 
 I agreement, if the elimination of a specific duration clause for retiree benefits reflects the parties’ intent that retiree welfare benefits are vested, then the termination of the P & I under the general duration clause would not affect those vested benefits.
 
 See Pl. Resp.Br.
 
 at 10
 
 (citing Yard-Man
 
 (“the inclusion of specific durational limitations in other provisions of the [CBA] suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements”)).
 
 [4]
 

 The court finds that neither Plaintiffs’ nor Miehelin’s construction of the duration provisions of the P & I Agreements renders unambiguous the parties’ intent to vest or not vest retiree welfare benefits under the agreement. As a general rule, a contract should be read to give effect to all of its provisions.
 
 Guaranty Financial Servs. v. Ryan,
 
 928 F.2d 994, 999 (11th Cir.1991) Both Miehelin’s construction, that welfare benefits are limited by the general duration clause of the agreements, and Plaintiffs’ construction, that the absence of .a specific durational limitation with respect to retiree benefits leads to the conclusion of vesting, are reasonable interpretations of the agreements. Accordingly, the court finds these provisions do not render the meaning of the Agreement unambiguous.
 

 4.
 
 Summary
 

 As the court previously noted in, its earlier memorandum opinion, “a .contract is ambiguous when it is reasonably susceptible to more than one interpretation.”
 
 See Groover,
 
 187 F.R.D. at 671
 
 (citing Stewart
 
 980 F.2d at 701). For the reasons detailed above the court finds that the P & I Agreements are ambiguous as to the parties’ intent to vest welfare benefits.
 

 C.
 
 Extrinsic
 
 Evidence,
 
 [5]
 

 The court will now consider the extrinsic evidence submitted by the parties. Miehe-lin has relied heavily on its interpretation of this evidence in moving for summary judgment. For the reasons discussed below, the court does not find that the extrinsic evidence renders the ambiguous Agreement unambiguous as to the intent of the parties to vest welfare benefits.
 

 1.
 
 Ambiguity and Extrinsic Evidence
 

 In disputes arising out of a contract, the document must first be construed by the court to determine if the document is ambiguous. Such a construction is one to be determined by a court as a matter of law,
 
 Stewart,
 
 980 F.2d at 701, and the general rule is that, at this stage in the case, the introduction of parole evidence to aid the court in the interpretation of a contract is prohibited.
 
 See Uransky v. First Federal Savings & Loan Assoc. of Ft. Myers,
 
 684 F.2d 750 (11th Cir.1982). If the court determines that the language of the contract is not ambiguous then parole evidence is not admissible to show the understanding of either party as to the meaning of the document.
 
 Insurance Concepts, Inc. v. Western Life Ins. Co.,
 
 639 F.2d 1108, 1110 (5th Cir.1981) On the other hand, if the court finds, as a matter of law, that the contact is ambiguous, then, as
 
 *1247
 
 a general rule, summary judgment is not proper and the court must submit the question to the trier of fact, who may consider the extrinsic evidence in determining, the parties’ intent.
 

 A collective bargaining agreement, however, is not governed by the same principles of interpretation as those that apply to private or commercial contracts. Federal labor law policy, as embodied by federal labor law legislation and judicially crafted rules of federal common law, governs. In this context, the Supreme Court has observed that:
 

 A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts (citation omitted) ... [I]t is a generalized code to govern a myriad of cases which the draftsman cannot wholly anticipate .... The collective agreement covers the whole employment relationship. It calls into being a new common law— the common law of a particular industry or of a particular plant, (citation omitted). In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements.
 

 Transportation-Communication Employees Union v. Union Pacific R.R.,
 
 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966).
 

 Therefore, in construing a labor agreement on summary judgment, a district court has considerably more latitude in considering extrinsic evidence. On the basis of this reasoning, most courts considering the question have decided that the parol evidence rule should not be rigidly applied to labor contracts.
 
 Stewart,
 
 980 F.2d at 701. At the same time, however, courts should give full
 
 effect to the
 
 clear meaning of a written contract. As the Seventh Circuit has noted, this liberal review of extrinsic evidence is circumscribed by a general concern that courts should not
 

 deprive! ] the parties of the protection of a written contract.... Since there is no similar structural necessity for a collective bargaining agreement to include an undertaking by the employer to pay lifetime medical benefits to retired employees, the use of extrinsic evidence to create such obligations nowhere alluded to in the contract would unjustifiably deprive the parties of the limitation of liabilities that is implicit in the negotiation of a written contract having a definite expiration date.
 

 Bidlack v. Wheelabrator Corp.,
 
 993 F.2d 603, 607 (7th Cir.) (en banc),
 
 cert. denied,
 
 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). This court would only add that the reverse is equally true; where a contract unambiguously vests welfare benefits in retiring employees, a court should not allow extrinsic evidence to vary the terms of an otherwise unambiguous agreement.
 

 2.
 
 Extrinsic Evidence
 

 Throughout this litigation, the parties have submitted numerous copies of deposition testimony, P & I Agreements, side-letters, and contract negotiation transcripts. Michelin has presented the court a single theory of the collective significance of this evidence, which relies heavily on the effect of various “side-letters” to the P & I Agreements before the court. In substance, Michelin has constructed an explanation of the totality of evidence as a course of performance of these agreements, which it asserts vitiates all ambiguity in the contract.
 

 Plaintiffs have attacked the significance of these side-letters as unworthy of credence. Plaintiffs maintain that the side letters are not contractual agreements because they are unilaterally entered, not signed by one party, or, in some cases not signed at all. For the reasons discussed below, the court need not address the legal significance of these side letters because
 
 *1248
 
 Michelin’s course of performance argument, as the court has styled it, does not resolve the inherent ambiguity in the agreements.
 

 The submissions of the parties establish a course of performance of each successive P & I Agreement. In the industry, it is apparently the custom that such Agreements last for three year terms and are subsequently renegotiated. Over the course of some thirty years, it has been the practice of Michelin and its predecessors to negotiate with the union regarding the welfare benefits of all active employees, including those active employees who retire while the negotiated agreement is in effect. By virtue of a side letter issued by the company, retirees who retired during the terms of expired P
 
 &
 
 I Agreements customarily received the same level of benefits as those provided the active employees, regardless of when (i.e., under which P & I Agreement) they retired.
 

 For example, the 1991 P & I Agreement contains, among other things, articles devoted to pension benefits, welfare benefits, supplemental worker’s compensation, and duration. The Agreement stated it constituted “a settlement for the duration of [the] Agreement of all retirement, pension, medical and life insurance, survivor income benefits, supplemental worker’s compensation. ...”
 
 See Def.Ex., I
 
 at 2. As is the custom of the parties, the Agreement did set the welfare benefits of those retiring during the term of the 1991 P
 
 &
 
 I Agreement, but no mention of past retiree’s benefits was made. In a side letter originally dated April 28, 1988, related to the 1988 P & I Agreement, but adopted and reissued on May 3, 1991, the company extended welfare benefits conferred, by the 1991 P & I Agreement to retirees who had retired under then expired Agreements:
 

 This letter will confirm our commitment made to you during the negotiation of the 1991 P
 
 &
 
 I Agreement with respect to extending certain medical benefits to certain employees.
 

 *
 
 % ¡'fi
 

 [T]he Company will provide certain benefits of the Hospital, Surgical, Medical, Drug, Dental and Major Medical Benefits Program as contained in Article 6 of such agreement ... to former employees terminated at the age of sixty-five (65) with Severance Pay and Pensioners (and their eligible dependents) who are covered by the Company’s ... [welfare benefits] preceding the effective date of such 1991 Agreement.
 

 Def.Ex. I
 
 [letter 2].
 

 In 1994, this course of conduct between the parties ended. In the negotiations leading up to the 1994 P
 
 &
 
 I Agreement Michelin indicated that it planned to reduce the welfare benefits of retired union workers. The union would not agree to Michelin’s proposed changes but, apparently because they asserted no authority to negotiate on behalf of past retirees, the union agreed not to sue if Michelin followed through on its proposal. The reductions in welfare benefits ensued.
 

 Michelin contends that this course of performance reveals (1) that the union was bargaining over retiree welfare benefits so that the retirees are now bound by the union’s agreement and (2) that because Michelin had only “extended” benefits to retirees by side letters, retirees’ welfare benefits were not vested.
 

 1.
 
 The Union as Bargaining Agent far Retirees
 

 It is unclear on the basis of the submissions of the parties whether the union was in fact negotiating on behalf of past retirees. There can be no question that the union negotiated those benefits on behalf of active employees. Michelin’s assertion, however, that union representatives were the bargaining representative of past retirees is unsupported by sufficient evidence to warrant such a finding on summary judgment.
 

 Michelin points to the following side-letter, Letter # 28, issued in conjunction with the 1991 P & I Agreement:
 

 
 *1249
 
 In the event the average annual Company contribution exceeds $5,000 per covered person, the excess shall be allocated to and paid by each covered person on a pro rata basis. Notwithstanding the foregoing, no covered person shall be required to make any contribution towards the premium costs for planned coverage until July, 1, 1997. Notwithstanding
 
 Pittsburgh Plate Glass
 
 or any Board or Court decision to the contrary, the parties agree that the subject of the $5,000 maximum set forth herein shall be considered a mandatory subject of bargaining in any subsequent negotiations occurring on or after April 1,1997.
 

 Def.Ex. I,
 
 at p. 803.
 

 The reference to
 
 Pittsburg Plate Glass
 
 is clearly a reference to
 
 Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,
 
 404 U.S. 157, 181, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) in which the Supreme Court held that retirees are not a bargaining unit under the LMRA and that retiree benefits are a permissive — not a mandatory — subject of bargaining.
 
 Id.
 
 Letter # 28 thus purports to make, notwithstanding
 
 Pittsburgh Plate Glass,
 
 the $5,000 cap per covered person a mandatory subject of bargaining.
 
 [6]
 

 According to Michelin, this is evidence that the union was representing retirees, and because the union was bargaining for past retirees, the retirees are now bound by the bargain struck. This assertion may be contradicted, however, by the minutes of the negotiations that resulted in the 19.94 P & I Agreement. In those negotiations, Michelin proposed changes to retirees’ welfare benefits. The union, however, refused to negotiate those changes, as the following highlights from the minutes from those meetings demonstrate:
 

 April 29,1994 Minutes:
 

 Stanley (Union): You’re asking us to reduce a retiree’s benefit.
 

 Stanley (Union): If I found this out on the floor, I’d be one upset Union Member.
 

 Wilkerson (Michelin): That’s why we’re talking about it now and we’re trying to keep the cost down.
 

 See Attachment Pl.Resp., Ex. D,
 
 (April 29, 1994 Session) at 4.
 

 May 2,1994 minutes:
 

 Armstrong (Union): We don’t have the right to bargain about retirees. There is a distinction between retirees and actives.
 

 See Attachment Pl.Resp., Ex. D
 
 (May 2, 1994) at 6.
 

 There is thus conflicting evidence as to whether the union was in fact the bargaining representative of the past retirees. On the basis of the submissions before the court and the
 
 Pittsburgh Plate Glass
 
 decision, the court is unable to resolve the issue at this time.
 

 2. The Effect of the Side Letters
 

 According to the parties, the benefits conferred by virtue of the side letters has had the effect of giving retirees greater benefits that they would have had if they had maintained the level of benefits provided under the P & I Agreement in effect during the year of retirement. Thus, Plaintiffs argue that the vested benefits are a minimum amount of benefits; any greater benefits conferred by operation of side letters does not affect the status of the benefits as vested. Plaintiffs point out that these benefits might be nothing more than a gift or perhaps a measure of goodwill on the part of Michelin towards its former employees.
 

 Michelin argues that the history of these side letters extending current benefit levels to past retirees is strong evidence that
 
 *1250
 
 the retirees’ benefits were not vested. The court agrees that this is evidence, but it is not evidence capable of rendering an ambiguous agreement unambiguous. Michelin, however, overstates the significance of these side letters:
 

 [The] ... side letter[ ] attached to every ... CBA, by its terms applies
 
 only
 
 to individuals who are not a part of the bargaining unit, including ‘Pensioners. (and their eligible dependents)----’ It is thus incontrovertible that management and labor have negotiated over existing retirees’ welfare plans rights for decades. That longstanding — and to date unopposed — practice leads inexorably to the question whether Plaintiffs are bound by the changes made in 1994 ... because the Union was authorized to represent their interests and negotiate changes on their behalf.
 

 Def.Br.
 
 at 38.
 

 First, the court has already determined that the evidence is inconclusive on the question of whether retirees were actually represented by the Union. Second, all of the side letters referred to by Michelin might be unilateral commitments made by the company. For example, the court has already mentioned the letter dated April 28,1988, but adopted and reissued on May, 3, 1991. That is a letter to the URW Policy Committee from Michelin, which provides:
 

 This letter will confirm
 
 our commitment
 
 made during the negotiation of the 1991 Pension and Insurance Agreement with' respecting to extending certain medical care benefits....
 

 # * * ❖
 

 Effective May 3, 1991, the Company
 
 will provide
 
 certain benefits ... to the former Employees terminated at age sixty-five (65) with Severance Pay and Pensioners (and their eligible dependents) who are covered by the Company’s [welfare benefit plans] ... preceding the effective date of ... [this] Agreement.
 

 Def.Ex. I
 
 [letter 2] (emphasis added).
 

 This might reflect an agreement with the union or it might reflect a unilateral commitment by Michelin. Michelin has pointed the court to other such Agreements, none of which clearly spell out the meaning of these letters. Michelin moves for summary judgment claiming that these letters evince a “side” agreement struck between the union and Michelin regarding past retirees. As noted, however, it is unclear whether these letters truly do represent the product of a negotiation, given the fact that it is unclear whether the union was, in fact, bargaining over past retirees.
 

 Plaintiffs assert that these side letters are unilateral commitments made by Michelin that do not represent a negotiated agreement between the retirees and the company. Accordingly, Plaintiffs argue that the mere fact that the company extended benefits to past retirees by a side letter agreement does not, by itself, render the parties’ intentions as to the vesting of welfare benefits clear.
 

 Plaintiffs’ interpretation of the course of performance evidence offered by Michelin is strained, but plausible. According to Plaintiffs, the extension of welfare benefits to past retirees is not clearly a negotiated agreement, but, rather, simply a unilateral commitment by the company to extend, for whatever reason, retiree welfare benefits.
 
 [7]
 
 
 *1251
 
 Plaintiffs argue, in sum, that the historically greater performance tendered by Michelin in the course of discharging its contractual obligations to retirees does not in any way reduce the level of performance owed to the retirees under that contract. The tender of performance in 1994 and 1997 must at least meet the level of performance owed to retires under the P & I Agreement in effect when a retiree retired.
 

 All of these arguments circle the main issue of whether retiree welfare benefits are vested under the P & I Agreements. None of them presents a context in which the court can clearly resolve the ambiguities inherent in the contract and the court is unwilling to rewrite the terms of an ambiguous contract based upon extrinsic evidence which suggest a hypothetical result. Although Michelin’s interpretation of the evidence might lend credence to its position that the retirement benefits were not intended to vest under the P & I Agreements, it requires one to make the inferential leap that the union was in fact the bargaining representative of the retirees. That leap is one left to the trier of fact.
 

 D.
 
 Yard-Man
 

 The court also must address an issue that is sure to resurface at trial. This issue needs to be resolved before trial begins. Plaintiffs argue that there is a judicially created “rebuttable presumption” that welfare benefits provided by a labor contract vest at retirement.
 
 Pl.Br.
 
 at 7. For this argument, Plaintiffs rely primarily on
 
 Int’l Union, UAW v. Yard-Man, Inc.,
 
 716 F.2d 1476 (6th Cir.1983),
 
 cert. denied,
 
 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984), and its progeny. (“Thus when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains as a retiree.”
 
 Id.
 
 at 1482). Both sides have extensively briefed this issue and have cited the court to a variety of decisions from different circuits, which are split on the question.
 

 1.
 
 Yard-Man and its Progeny
 

 Yard-Man
 
 was decided in the shadow of the preemptive statutory vesting and disclosure rules described in ERISA. Courts in the Sixth Circuit grappled with the question
 
 of how
 
 ERISA’s exemption
 
 of
 
 welfare plans from the mandatory vesting rules affects the ability of retirees to enjoin the unilateral termination or modification of retirement welfare benefits conferred by a labor contract. Early cases were quick to note that “nothing in ERISA indicates that Congress intended to make contracts unenforceable,” and thus courts analyzed the vesting of retirement welfare benefits in accordance with ordinary rule of contract construction.
 
 Holliday v. Xerox Corp.,
 
 555 F.Supp. 51, 55 (E.D.Mich. 1982).
 

 Those same courts, however, were often unwilling to fully effectuate Congress’ desire to exempt welfare plans from the vesting rules provided in ERISA. ERISA provides an express statutory exclusion of welfare plans from the stringent minimum vesting, participation, and funding standards imposed on pension plans, ERISA §§ 201(1), 301(a)(1), 29 U.S.C. §§ 1051(1), 1081 (a)(1), and also an exclusion of welfare benefits from the definition of “accrued benefits” in Treasury regulations, 26 C.F.R. § 1.41(a)-7(a)(ii), promulgated under ERISA § 1053(a), 26 U.S.C. § 411. The sharp statutory dichotomy between the mandatory vesting rules governing employee pension plans and the complete absence of statutory vesting rules for welfare benefit plans appears to have led some courts to stretch ERISA’s vesting rules well beyond their statutorily defined limits.
 

 
 *1252
 
 For example, in
 
 Hansen v. White Farm Equipment Co.,
 
 42 B.R. 1005 (N.D.Ohio 1984),
 
 rev’d,
 
 788 F.2d 1186 (6th Cir.1986) the district court fashioned a rule of federal common law that all retirement benefits vest at retirement.
 
 Id.
 
 at 1019. The district court noted that Congress had exempted welfare benefit plans from ERISA’s mandatory vesting rules, but that this exemption did not amount to “an express endorsement of unfettered unilateral termination of such plan.” 42 B.R. at 1011-13. The court found that'Congress had been “silent” on the issue of whether welfare benefit plans vest, thus justifying the creation of a rule of federal common law.
 
 Id.
 
 1015. The rule the court created was that retirement welfare benefits, like pension benefits, were a form of deferred compensation, which vested at retirement, and could not be terminated, “even in the face of language which unequivocally au: thorizes such action.”
 
 Id.
 
 In effect, the
 
 White Farm
 
 decision extended ERISA type protection to welfare benefits, despite Congress’ desire to exempt those plans from the statute’s stringent vesting rules.
 

 The Sixth Circuit reversed the district court’s holding that the Congressional exemption of welfare benefits from the strictures of pension benefit vesting rules was a “hole” in the statutory framework that indicated Congressional silence on the issue.
 
 In re White Farm,
 
 788 F.2d 1186, 1193 (6th Cir.1986). Instead, the Sixth Circuit held that “Congress recognized the differences between welfare benefit plans and pension plans ... [and the court found] no basis for finding mandatory vesting in ERISA of retiree welfare benefits ...” in the face of clear Congressional intent to the contrary.
 
 Id.
 

 The court, however, recognized that even though ERISA did not govern the vesting of welfare benefits, the parties to a labor contract could create nonforfeitable rights to such benefits: “the parties may themselves set out by agreement or by private design ... whether retiree welfare benefits vest, or whether they may be terminated.”
 
 Id.
 
 Despite, however, recognizing that the statutory exemption of welfare benefits represented Congressional intent that such benefits were not subject to a federal rule of decision that welfare benefits vested as a matter of law, the court nonetheless left open the possibility that courts could create rules of contract construction or judicially created presumptions that could be designed to resist a finding of non-vested welfare benefits.
 
 Id.
 
 at 1193. (“In construing such agreements, courts may draw inferences or make presumptions as this court has done in construing collective bargaining agreements providing welfare benefit plans.”)
 

 In this cause, the Plaintiffs argue that
 
 Yard-Man
 
 established such a judicially created presumption that welfare benefits vest at retirement. The Plaintiffs assert that the
 
 Yard-Man
 
 line of cases establish that the durational limit of retirement benefits conferred by a labor contract is defined by the ordinary meaning of the word “retirement,” and, consequently, the duration of retirement benefits is measured by and “dependent] upon ... [a retiree’s] status as ... retire[d]”.
 
 Pl.Br.
 
 at 7. Thus, according to Plaintiffs, there is a judicially recognized inference or presumption that retirement benefits conferred by contract vest at retirement because retirement benefits are defined in terms of the “inherent duration of the retirement status beyond any particular contract....”
 
 UAW v. Cadillac Malleable Iron,
 
 728 F.2d 807 (6th Cir.1984);
 
 see also, Apponi v. Sunshine Biscuits,
 
 652 F.2d 643, 646 (6th Cir.1981).
 

 Michelin responds (1) that
 
 Yard-Man
 
 is not good law and (2) that the
 
 Yard-Man
 
 inference is inapplicable because the contract in this case is unambiguous and the
 
 Yard-Man
 
 rule does not apply to contracts that are unambiguous. The court, however, has found the P & I Agreements to be ambiguous on the question of whether the parties intended to vest welfare benefits. The court, however, agrees with Michelin that
 
 Yard-Man
 
 is not good law in this circuit.
 

 
 *1253
 
 Many courts that have considered the question have rejected the
 
 Yard-Man
 
 inference for the same reasons that the Sixth Circuit rejected the district court’s holding in
 
 White Farm.
 
 For example, many circuits have held that because vesting of welfare plan benefits constitutes an extra-ERISA commitment, an employer’s commitment to vest such benefits is not to be inferred but must be stated in clear and express language.
 
 See Int’l Union, UAW v. Skinner Engine Co.,
 
 188 F.3d 130, 139 (3d Cir.1999);
 
 Spacek v. Maritime Ass’n, ILA Pension Plan,
 
 134 F.3d 283, 293 (5th Cir.1998);
 
 Sprague v. General Motors Corp.,
 
 133 F.3d 388, 400 (6th Cir.1998) (stating that commitment to vest “is not to be inferred lightly” and that it must be found in express language from plan documents);
 
 John Morrell & Co. v. United Food and Commercial Workers Int’l Union, AFL—
 
 CIO, 37 F.3d 1302, 1304 (8th Cir.1994) (“[Cjourts are reluctant to read more benefits into an ERISA plan than its plain language confers.”);
 
 Gable v. Sweetheart Cup Co.,
 
 35 F.3d 851, 855 (4th Cir. 1994) (noting that because employer’s promise of lifetime benefits constitutes an “extra-ERISA commitment,” courts may not “lightly infer the existence of an agreement to vest employee welfare benefits”);
 
 Sengpiel v. B.F. Goodrich Co.,
 
 970 F.Supp. 1322, 1337 (N.D.Ohio 1997) (“Courts may not casually infer the existence of vesting; doing so would undercut Congress’ considered decision that, while pension benefits are strictly regulated and guaranteed, welfare benefits have no such protection.”),
 
 aff'd,
 
 156 F.3d 660 (6th Cir.1998);
 
 Adams v. Avondale Indus., Inc.,
 
 905 F.2d 943, 947 (6th Cir.1990) (cautioning that in determining scope and extent of employer’s obligations under welfare benefit plans, courts avoid undermining Congress’ “considered decision that welfare benefit plans not be subject to a vesting requirement”).
 

 On the basis of this reasoning, some courts have openly rejected or disagreed with the
 
 Yard-Man
 
 inference.
 
 See, e.g., Skinner,
 
 188 F.3d at 141 (“the
 
 Yard-Man
 
 inference may be contrary to Congress’ intent in choosing specifically not to provide for the vesting of employee welfare benefits”);
 
 Anderson v. Alpha Portland Indus., Inc.,
 
 836 F.2d 1512, 1517 (8th Cir. 1988) (“We disagree with
 
 Yardr-Man ...
 
 [and] believe that it is not at all inconsistent with labor policy to require plaintiffs to prove their case without the aid of gratuitous inferences”);
 
 United Paper-workers International Union, AFL
 
 —CIO
 
 v. Champion International Corp.,
 
 908 F.2d 1252, 1261 n. 12 (5th Cir.1990) (“To the extent that
 
 Yard-Man
 
 held that there is, as a general proposition, an inference of an intent to vest retirement benefits (because they are ‘status’ benefits), we find merit in the Eighth Circuit’s criticism in
 
 Anderson
 
 of this aspect of
 
 Yard-Man
 
 and find no basis in logic or federal labor policy for such a broad inference”).
 

 2.
 
 The Yardr-Man. Inference
 

 In
 
 Yard-Man,
 
 the company planned to close its operating plant upon the expiration of its collective bargaining agreement.
 
 Id.
 
 at 1480. Before taking any action, the company notified its retirees that their insurance benefits would terminate upon the plant closing, and the union filed suit claiming that the benefits had vested under the labor contract and were not subject to termination at the expiration of the collective bargaining agreement.
 
 Id.
 

 The key provision of the contract before the court was: “When the former employee has attained the age of 65 years then: (1) The Company will provide insurance benefits equal to the active group benefits for the former employee and his spouse.”
 
 Id.
 
 at 1480. The court found that this provision was ambiguous, but construed it in light of other provisions of the labor agreement and concluded that the agreement represented an unambiguous intent to vest retirement benefits..
 
 Id.
 
 Some of the reasons the court found persuasive included: (1) “the impracticality of hinging retiree benefits to events as unpredictable and unstable as active worker layoffs make
 
 *1254
 
 it improbable that retiree benefits were intended to depend in duration upon the fortunes of the active employees(2) “Yard-Man’s own course of conduct in continuing retiree insurance benefits after plant closure beyond the point as which insurance benefits could have terminated for the active employees ... (3) and “the inclusion of specific durational limitations in other provisions of the contract ... suggesting] that retiree welfare benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties’ contemplated long term relationship”
 
 Id.
 
 at 1481-82.
 

 The court also found additional extra-contractual, contextual reasons persuasive for finding that the parties probably intended the welfare benefits to vest. First, the court noted that under the National Labor Relations Act, retiree benefits are a permissive and not a mandatory condition of collective bargaining.
 
 Id. citing Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,
 
 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). Thus, the court found it unlikely that — given the context in which they were negotiated — such rights were not intended to vest because
 

 the employees are presumably aware that the union owes no obligation to bargain for continued benefits for retirees. ‘If they forego wages now in expectation of retiree benefits, they would want assurance that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements.
 

 Id.
 
 at 1482.
 

 Second, the court described retirement benefits as “status benefits” (that is, they depend upon one’s “status” as retired) which, given the context in which they were negotiated, the parties probably intended to accrue and vest upon retirement.
 
 Id.
 
 The court found that this factor, in the appropriate circumstances, gave rise to an inference of vesting:
 

 Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree. This is not to say that retiree insurance benefits are necessarily interminable by their nature. Nor does any federal labor policy identified to this Court presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent. Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent.
 
 Standing alone this factor would be insufficient to find an intent to create interminable benefits. In the present case, however, this contextual factor buttresses the already sufficient evidence of such intent in the language of the agreement itself.
 

 Id.
 
 at 1482 (emphasis added).
 

 Plaintiffs appear to argue that this inference of vesting recognized in
 
 Yard-Man
 
 rises to the level of a gap-filler or “default rule” which would control absent express agreement to the contrary. Specifically, Plaintiffs term the inference of vesting a “rebuttable presumption.”
 
 Pl.Br.
 
 at 7. The only authority cited to the court for the proposition that this inference of welfare benefits is something other than a rule of contract construction is the above quoted passage from
 
 Yard-Man.
 
 In
 
 Yard-Man,
 
 however, the court clearly stated that nothing in federal labor policy “favored the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent” and that “standing alone this factor would be insufficient to find an intent to create interminable benefits.”
 
 Id.
 
 Therefore, the court does not agree that
 
 Yard-Man
 
 created any such default rule, rebuttable presumption, or gap-filler. The court in
 
 YardMan
 
 was clearly construing an ambiguous term in a labor contract by reference to the context in which it was negotiated and, hence, the inference of vesting cited by the
 
 *1255
 
 Plaintiffs is merely a rule of construction and not something more.
 
 See Stewart,
 
 980 F.2d at 702, n. 3 (“The parties dispute whether the court should adopt the
 
 Yard-Mam,
 
 inference....
 
 Yard-Man
 
 is distinguishable because the Sixth Circuit only used the inference to resolve an ambiguity....”).
 

 The Sixth Circuit has recently explained this understanding of the
 
 Yard-Man
 
 inference. In
 
 Int’l Union, United Auto., Aerospace Workers of America v. BVR Liquidating, Inc.,
 
 190 F.3d 768 (6th Cir.1999) the court noted that
 

 Yard-Man
 
 does not shift the burden of proof to the employer, nor does it require specific anti-vesting language before a court can find that the parties did not intend benefits to vest. Rather, the
 
 Yard-Man
 
 inference, and the other teachings of the opinion regarding contract interpretation and the consideration of extrinsic evidence, simply guide courts faced with the task of discerning the intent of the parties from vague or ambiguous CBAs.
 

 Id.
 
 at 772.
 

 3.
 
 Yard-Man in the Eleventh Circuit.
 

 In this cause, both sides have briefed the court on the question of whether the inference of vesting described in
 
 YardMan
 
 should be applied to the P & I Agreements before the court. The parties disagree about whether the Eleventh Circuit has adopted such a rule and have cited the court to numerous decisions from almost all of the federal circuits. The court has only located four instances in which the Eleventh has cited to
 
 Yard-Man.
 
 In
 
 Carrier’s Container Council v. Mobile Steamship Assoc. Inc.,
 
 896 F.2d 3330 (11th Cir. 1990) and
 
 Connors Steel,
 
 855 F.2d at 1504, the Eleventh Circuit cited to
 
 Yard-Man
 
 generally and noted that the court fully concurred with the reasoning in
 
 YardMan.
 
 In
 
 Vertex Construction,
 
 the court cited to
 
 Yard-Man
 
 for the proposition that federal substantive law governs the interpretation of labor contracts. 932 F.2d at 1448. Finally, and most recently the Eleventh Circuit has cited to
 
 Yard,-Man
 
 in
 
 Stewart.
 
 In that case, the court refused to address the question of whether the
 
 YardMan
 
 inference was binding in the Eleventh Circuit:
 

 The parties dispute whether this court should adopt the
 
 “Yard-Man
 
 inference.” In
 
 Yard-Man
 
 the Sixth Circuit concluded that the clause of a CBA providing for the duration of retirees’ insurance benefits was ambiguous. While attempting to resolve the ambiguity, the court inferred that “when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.”
 
 But see United Paperworkers,
 
 908 F.2d at 1261 n. 12;
 
 Anderson,
 
 836 F.2d at 1516 (rejecting any general inference of intent to vest retirees’ benefits). Yard-Man is distinguishable because the Sixth Circuit only used the inference to help it resolve an ambiguity and never indicated that the inference could establish an ambiguity. In any event, it is not necessary to resort to any inference to conclude that this contract is subject to more than one meaning.
 

 Stewart,
 
 980 F.2d at 702 n. 3.
 

 It is thus unclear whether the
 
 YardMan
 
 inference is the law of this circuit. Although the Eleventh Circuit has generally approved of the reasoning in
 
 YardMan,
 
 it has never directly addressed the question of whether that inference ought to be followed. In the only occasion where it acknowledged that such an inference existed,
 
 Stewart,
 
 the court also acknowledged those circuits that disagree and reject the
 
 Yard-Man
 
 inference.
 

 After consideration, the court is of the opinion that, in this case, even if such an inference existed and were recognized in this circuit, it would not sufficiently tilt the scales in favor of Plaintiffs to warrant a finding that the parties intended to vest
 
 *1256
 
 welfare retirement benefits, given the ambiguity inherent in the contract.
 

 y.
 
 CONCLUSION
 

 Because there are genuine issues of material fact concerning whether the disputed changes to the Plaintiffs welfare benefits violated specific contractual duties owed by Michelin, both Plaintiffs Motion for Summary Judgment and Michelin’s Motion for Summary Judgment are due to be and are both hereby DENIED. The Plaintiffs’ Motion to Allow Supplemental Submission is hereby DENIED.
 

 MEMORANDUM OPINION AND ORDER ON RECONSIDERATION
 

 I.
 
 INTRODUCTION
 

 On February. 17, 2000, the court issued a Memorandum Opinion and Order denying the Motion for Summary Judgment filed in this action by Defendant Michelin North America, Tnc. (“Michelin”). - Currently before the court is Michelin’s Motion to Reconsider (doc. # 61) that ruling. After a review of the grounds set forth in that Motion and, for the reasons discussed below, Michelin’s Motion to Reconsider is due to be DENIED. The court, however, would like to take this opportunity to clear up several issues that continue to resist resolution.
 

 II.
 
 STANDARD FOR RECONSIDERATION
 

 District courts necessarily have substantial discretion in ruling on motions for reconsideration.
 
 Sussman v. Salem, Saxon & Nielsen,
 
 158 F.R.D. 689 (M.D.Fla.1994). Motions for reconsideration generally serve a very narrow function: they are designed solely to correct manifest errors of law or fact or to present newly discovered evidence that could not have been discovered at the time of the original motion.
 
 See
 
 Fed.R.Civ.P. 60. Because “litigants cannot be repeatedly called upon to backtrack through the paths of litigation,” reconsideration of a previous order is an extraordinary remedy to be employed sparingly.
 
 Sussman,
 
 153 F.R.D. at 694. Additional facts and arguments that should have been raised in the first instance are not appropriate grounds for a motion for reconsideration.
 
 Villaflores v. Royal Venture Cruise Lines, Ltd.,
 
 No. 96-2103, 1997 WL 728098, at *2 (M.D.Fla. Nov. 17, 1997), aff'd. in part, vac’d in part by
 
 Wilkins v. Commercial Inv. Trust Corp.,
 
 153 F.3d 1273 (11th Cir. 1998);
 
 see also American Home Assurance Co. v. Glenn Estess & Assocs., Inc.,
 
 763 F.2d 1237, 1239 (11th Cir.1985) (considering new arguments post-order affords parties “two bites at the apple”);
 
 Renfro v. City of Emporia, Kan.,
 
 732 F.Supp. 1116, 1117 (D.Kan.1990) (noting that a party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a motion for reconsideration).
 

 Courts have recognized three grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice.
 
 See Sussman,
 
 153 F.R.D. at 694;
 
 Major v. Benton,
 
 647 F.2d 110, 112 (10th Cir.1981).
 

 III.
 
 DISCUSSION
 

 In its Motion to Reconsider, Michelin argues (again) that the P & I Agreements unambiguously state that retiree benefits terminate at the expiration of the underlying P & I Agreement. The court will attempt to make the best case that it can for Michelin, and then show why these Agreements are nonetheless ambiguous.
 

 1.
 
 Michelin’s Best Case: The Plain Language of the 1991 P & I Agreement
 

 Michelin asserts that the court did not give due attention to paragraph 6.1 of the Agreements. The court therefore will attempt to make the most of paragraph 6.1, while resolving all doubts in Michelin’s fa
 
 *1257
 
 vor. However, the contracts are still ambiguous.
 
 [1]
 

 The parties agree that all of the various P & I Agreements at issue in this suit are substantially identical. The court will therefore focus on one of these Agreements, the 1991 P & I Agreement, as representative of all of the Agreements at issue.
 

 Article 6 of the 1991 P & I Agreement describes the welfare benefits provided by Michelin to its employees. For the present purpose, there are two relevant sections of Article 6:
 

 1f 6.1 Effective as of
 
 May 3, 1991
 
 and/or
 
 the duration of this Agreement,
 
 the Company will provide to eligible employees and their dependents as defined in Paragraph 6.8, the following plan [welfare benefits].
 

 See
 
 1991 Agreement, If 6.1 (emphasis added).
 

 If 6.14 Employees who retire and who arc eligible under the
 
 1991
 
 Pension and Insurance Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits described in this Article, provided however, that each former Employee eligible for a Deferred Vested Pension whose employment with the Company is terminated at or after his attainment of the age of sixty (60) years shall also receive such benefits effective as of the latter of his Normal Retirement Date or the first day of the month for which he receives a Deferred Vested Pension.
 

 See id.
 
 at II 6.14.
 

 The duration of the 1991 P & I Agreement is governed by Article 10 of the Agreement. For the present purpose, there are two relevant paragraphs:
 

 II 10.8 This Agreement shall continue in effect through
 
 April 2k, 199k,
 
 and thereafter for yearly periods except as provided in Paragraph 10.4.
 

 See id.
 
 at If 10.3.
 

 If 10.4 This Agreement shall continue in effect until the
 
 2klh
 
 day of
 
 Apñl, 199k■
 
 Thereafter, it shall renew itself for yearly periods unless written notice is given by either party to the other not less than sixty (60) days but not more than seventy-five (75) days, prior to the expiration date or any extension thereof, that it is desired to terminate or amend the Agreement.
 

 See id.
 
 at If 10.4.
 

 As is clear from the juxtaposition of these four paragraphs, the 1991 P & I Agreement clearly provides that all welfare benefits terminate at the expiration of the Agreement. Paragraph 6.1 states that all benefits described in Article 6 are provided only for the duration of the Agreement.
 
 [2]
 
 Paragraph 6.14 provides that employees who retire during the tenancy of the 1991 P
 
 &
 
 1 Agreement are entitled to the same benefits provided active employees. Because paragraph 6.14 is part of Article 6, it is subject to paragraph 6.1. Thus, Article 6, by its plain language, limits Micheliris duty to provide retiree welfare benefits to the duration of the 1991 P & I Agreement.
 

 The duration of the 1991 P & I Agreement is governed by Article 10 of the Agreement, and it is undisputed that the 1991 P & I Agreement terminated in accordance with the procedure outlined in Article 10. Accordingly, Micheliris duty to provide welfare benefits, as required by paragraph 6.14, to those employees who retired under the 1991 Agreement has also expired.
 

 This is Micheliris plain language argument.
 

 
 *1258
 
 2.
 
 Michelin’s Challenge to the Plaintiff’s Reading of this Plain Language
 

 The Plaintiffs do not agree with this interpretation of the Agreements and assert that, upon closer inspection, the language of the Agreements unambiguously evince an intent to vest retirees with lifetime benefits. The Plaintiffs’ arguments in support of this assertion fall into one of three general categories, each of which the court will address in light of Michelin’s arguments to the contrary.
 

 a.
 
 Paragraph 6.14
 

 The Plaintiffs rely heavily on paragraph 6.14 for their assertion that benefits were intended to vest.
 

 1.
 
 “Shall Receive”
 

 First the Plaintiffs argue that the language of paragraph 6.14 evinces an intent to vest retiree welfare benefits: “employees who retire and who are eligible under the 1991 Pension and Insurance Agreement for a Pension (other than a Deferred Vested Pension),
 
 shall receive
 
 the benefits described in this Article.”
 
 See supra
 
 (emphasis added). Plaintiffs argue that the words “shall receive” unambiguously evince an intent to vest.
 

 For this proposition Plaintiffs argue that the word “ ‘shall’ has two possible meanings, both suggesting the permanence of the right. To the extent that it is compulsory, it compels that those who are eligible also must be eligible for medical insurance. To the extent that the term expresses a future tense, it suggests long term entitlement.”
 
 Plaintiff’s Brief
 
 at 8.
 

 Of course, the mere fact that the word “shall” can indicate some sense of futurity of obligation or compulsion to act does not, by itself, unambiguously render infinite the obligation so indicated. The use of the word “shall” is equally consistent with the more common understanding that the word implies. For example,
 
 Webster’s Dictionary
 
 contains the following explanation:
 

 I “shall go” implies nearly a simple futurity; more exactly, a foretelling or an expectation of my going, in which, naturally enough, a certain degree of plan or intention may be included; emphasize the shall, and the event is described as certain to occur, and the expression approximates in meaning to our emphatic “I will go.”
 

 Webster’s Revised Unabridged Dictionary
 
 (1996). Accordingly, and contrary to Plaintiffs’ assertions, the word “shall” does not necessarily “indicate the permanence of the right.” It would have been perfectly consistent with the English language and the rules of grammar to have written the contract to say either (1) “Eligible retirees shall receive welfare benefits for the rest of their lives,” or (2) “Eligible retirees shall receive welfare benefits for the duration of this contract.” Although Plaintiffs urge the court to adopt the former, the contract clearly intends the latter.
 

 Moreover, as the passage from
 
 Webster’s
 
 suggests, the use of the word “shall” in this situation probably indicates the degree of certainty with which the conferring language operates. As captured in the phrase, “I shall go,” the inclusion of the word “shall” is indicative of the intent to do something and not, necessarily, reflective of its duration. Thus, Plaintiffs’ reb-anee on the word “shall” as indicative of the permanence of the welfare rights conferred under the applicable P & I Agreement is misplaced. Instead, Michelin argues, the durational provisions found in paragraph 6.1 and Article 10 control.
 

 Michelin’s reading of the above provision is buttressed by consideration of the way in which the word “shall” is used throughout the agreement. The provision in question, paragraph 6.14, is the portion of the 1991 Agreement that confers welfare benefits upon retirees. The use of the word “shall” appears to be the operative or per-formative word in the conferring language. As noted, Plaintiffs claim that the verb
 
 *1259
 
 also serves as an indication of the expected duration of the benefit so conferred. However, it is clear that throughout the Agreement the draftsmen chose the word “shall” to indicate obligations due under the contract. One would be hard pressed to find a single example under any of the applicable P & I Agreements submitted to the court where the word “shall” was not used as the operative or performative verb in the Agreement.
 

 The court agrees with the result that other courts have reached when confronted with similar language in welfare benefits contracts; such language was found an insufficient indication of an unambiguous intent to vest welfare benefits.
 
 See, e.g., Joyce v. Curliss-Wright Corp.,
 
 171 F.3d 130, 134 (2d Cir.1999) (find that phrase “insurance benefits will be provided for employees ... [who become] entitled to receive pension benefits” did not evince an unambiguous intent to vest welfare benefits);
 
 Int’l Union, UAW v. Skinner Engine Co., 188 F.3d 180, 141
 
 (3d Cir.1999) (finding that phrases like “will continue” and “shall remain” do not unambiguously evince an intent to vest welfare benefits).
 

 Michelin’s plain language argument appears to survive this argument of the Plaintiffs.
 

 2.
 
 The Tie Between Paragraph 6.14 and Pension Beneñts.
 

 Plaintiffs also claim that the use of Pension benefits as a criterion for being eligible for welfare benefits is enough to show that the parties intended to unambiguously vest welfare benefits. Although it is true that retirees under the applicable P & I Agreement have ERISA protections for their pension benefits, the mere limitation of retiree welfare benefits to pensioners does not necessarily lead to the conclusion that welfare benefits were meant to vest alongside those pensions.
 
 See, e.g., Cur-tiss-Wright Corp.,
 
 171 F.3d at 134. This is particularly true considering that Congress explicitly exempted welfare benefits from ERISA’s mandatory vesting rules.
 
 See Schoonejongen,
 
 514 U.S. at 78, 115 S.Ct. 1223. It would collapse the distinction that Congress chose to make between welfare benefits, which are not statutorily vested, and pension benefits, which are statutorily vested, if the court were to consider the fact that pension benefits are vested in deciding whether welfare benefits are vested.
 

 According to Miehelin, the contract plainly says that all welfare benefits provided under Article 6 are provided for the duration of the Agreement, and the court cannot simply ignore such plain language.
 
 See Guaranty Financial Services v. Ryan,
 
 928 F.2d 994, 999 (ilth Cir.1991) (“a contract should be construed so as to give effect to all the contract’s provisions. Similarly, if two clauses of a contract appeal1 to be in conflict, the preferred interpretation is the one that gives a harmonious interpretation to the clauses”)
 
 (quoting Johnson Controls, Inc. v. City of Cedar Rapids,
 
 713 F.2d 370, 374 (8th Cir.1983).) To interpret the Agreements as the Plaintiffs suggest would effectively read paragraph 6.1 out of the Agreement. Again, Michelin’s plain language argument, if accepted, survives this argument.
 

 3.
 
 Expressio Unius: the Lack of Specific Durational Language.
 

 The Plaintiffs also rely on an adaption of the famous interpretative maxim
 
 expressio unius est exclusio aüeñus, see Herman & MacLean v. Huddleston,
 
 459 U.S. 375, 388, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), which has been given explicit application in the present context.
 
 See, e.g., Carriers Container Council, Inc. v. Mobile Steamship Ass’n, Inc.,
 
 896 F.2d 1830, 1339 (11th Cir. 1990) (“a general term clause in a collective bargaining agreement does not imply a cutoff date for other clauses of the agreement that have no durational language”)
 
 (citing Yard-Man,
 
 716 F.2d at 1482). The Plaintiffs contend that because paragraph 6.14 does not have specific du-rational language relating to retiree benefits (i.e., 116.14 does not say something like
 
 *1260
 
 “retirement benefits are limited to the duration of this contract”),
 
 Carriers Container Council
 
 and
 
 Yard-Man
 
 mandate that the contract is ambiguous on the question of vesting. The court will articulate the best case that it feels _ can be made to support Michelin’s argument that this contention is wrong:
 

 In
 
 Yard-Man
 
 the Sixth Circuit found that the
 

 the inclusion of specific durational limitations in other provisions of the current collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties’ contemplated long term relationship. Article XIX, for example, provides that “savings and pension plan programs” continue only for the duration of the collective bargaining agreement. No such specific limitation was provided to similarly restrict payment of retiree insurance benefits to the life of the collective bargaining agreement.
 

 716 F.2d at 1482.
 

 The court might hold that the case sub judice, is distinguishable, however, because the retirement benefits and the active employees benefits in
 
 Yard-Man
 
 were conferred by separate Articles of the collective bargaining agreement. The latter Article contained specific durational language; the former did not.
 
 See id.
 
 Accordingly, the court found that the parties’ intentions regarding the duration of retirement benefits were ambiguous.
 

 In the instant action, the retiree and the active employee benefits are conferred by the
 
 same
 
 Article of the Agreement (i.e., Article 6), which
 
 does
 
 have specific dura-tional language. The court might agree with Michelin that what the Plaintiffs fail to grasp is that the durational language of paragraph 6.1, by the very structure of Article 6, is distributed throughout the whole of Article 6. Thus
 
 Yard-Man
 
 and
 
 Carriers Container Council
 
 are distinguishable from the instant action and, ironically, counsel a finding against the Plaintiffs on this point: the negative implication of
 
 Yard-Man
 
 is that where specific dura-tional language does exist, as in this case, the benefits so conferred are so limited.
 

 So concludes Michelin’s best case on the plain language of the statute. The court does not endorse the above reading of paragraph 6.1, but will assume that it is so in order to analyze whether, even given that reading, the contract remains ambiguous.
 

 b.
 
 The Ambiguities that Remain: the Flaw in Michelin’s Case
 

 Assuming that the above rendering of the arguments reaches a correct conclusion, there are nonetheless provisions of the Agreement that a factfinder may find áre simply irreconcilable with the above interpretation of the contract. To demonstrate this ambiguity, the court will consider one of them:
 

 1.
 
 Deferred, Vested Pensioners
 

 Even in the face of Michelin’s best case, paragraph 6.14 becomes ambiguous as one delves into it in detail. It bears repeating:
 

 116.14 Employees who retire and who are eligible under the 1991 Pension and Insurance Agreement for a Pension (other than a Deferred Vested Pension), shall receive the benefits described in this Article, provided however, that
 
 each former Employee eligible for a Deferred Vested Pension whose employment with the Company is terminated at or after his attainment of the age of sixty (60) years shall also receive such benefits effective as of the latter of his Normal Retirement Date or the first day of the month for which he receives a Deferred Vested Pension.
 

 This has been raised repeatedly by Plaintiffs in briefs with no response from Michelin. What can the underlined portion mean? The question haunts Michelin’s interpretation of the contract, and, when considered directly, demonstrated a considerable ambiguity on the entire issue.
 
 *1261
 
 The underlined portion of paragraph 6.14 is laced with words that have been previously defined throughout the Agreement. The court must first “look up” the definition in the relevant portion of the Agreement and then must unpack the entire phrase’s meaning based upon the defined terms.
 

 a. “each former Employee ...”
 

 The word “Employee” is defined in Article 1 of the 1991 Agreement as follows:
 

 “Employee” shall mean any employee of the Company while, during the life of this Agreement, is in a collective bargaining unit at the Fort Wayne, IN and Tuscaloosa, AL plants.
 

 Article 1,1Í 1.2(F) of the 1991 P & I Agreement.
 

 What does the term “former Employee,” as it is used in the underlined portion of paragraph 6.14, mean? A logical meaning would be: “each person who used to be in a collective bargaining unit at Tuscaloosa or Fort Wayne during the period of time that the 1991 Agreement was in force.”
 

 b. “eligible for a Deferred Vested Pension ...”
 

 Which “former employees” are “eligible for a Deferred Vested Pension”? The answer to this question is clearly set out in the Agreement:
 

 Notwithstanding any other provisions of the Non-Contributory Pension Plan, an Employee whose employment shall be terminated on or after the effective date of this Agreement shall be eligible for a Deferred Vested Pension as provided in Paragraph 1.4 of the Plan if such Employee at the time of such termination of employment (a) shall have at least five years of Credited Service, (b) shall not have attained the Age of sixty-five (65), and (c) shall not be eligible for or receiving any other type of Pension under the Plan based (in whole or in part) on Credited Service prior to the date of such termination.
 

 Article 1, 111.3 (D) of the 1991 P & I Agreement.
 

 c. “Normal Retirement Date ...”
 

 Again, this term is defined in the Agreement:
 

 “Normal Retirement Date Shall mean the first day of the calendar month next following the Employee’s attainment of age sixty-five (65).”
 

 Article 1, 111.2(1) of the 1991 P & I Agreement.
 

 Unpacking the meaning of the underlined portion of paragraph 6.14 is no easy task. A hypothetical scenario will illustrate the problem:
 

 Suppose that a 60 year old who has worked at the Tuscaloosa Plant for six (6)-years terminated his employment under the 1991 P
 
 &
 
 I Agreement on the first day the Agreement went into effect. Such a person is clearly a “former Employee” as the court just described that term above (i.e., he is a person who used to be in a bargaining unit during the term of the Agreement). This person is also eligible for a Deferred Vested Pension: he has at least five years of Credited Service and he is not sixty-five years old. He can elect to begin receiving this Pension at the age of 55 or greater.
 
 See
 
 Article 1, If 1.4 of the 1991 P & I Agreement; Article 1, H 1.5(4) of the 1991 P & I Agreement. He will receive this Pension at least by the age of 65, his Normal Retirement Date.
 
 See
 
 Article 1, K 1.5(4) of the 1991 P
 
 &
 
 I Agreement.
 

 It is clear that this employee is
 
 not
 
 eligible to receive welfare benefits until he reaches the age of sixty-five. This is true because of the last portion of paragraph 6.14(a): “ ... shall also receive such benefits effective as of the latter of his Normal Retirement Date or the first day of the month for which he receives a Deferred Vested Pension.”
 

 Thus, this hypothetical employee is promised welfare benefits that he cannot receive until
 
 after
 
 the contract has expired. He terminated his employment at the age
 
 *1262
 
 of 60 on the first day that the 1991 P & I Agreement went into effect. He will reach his Normal Retirement Date sometime in 1996. Thus, the earliest he could possibly receive any benefits under this provision would be well after the termination of the 1991 P
 
 &
 
 I Agreement. In other words, if retirement benefits are not vested, then, the promise made by Michelin to this employee in paragraph 6.14 is illusory.
 

 Although the court has rejected the so-called
 
 Yard-Man
 
 inference, it does find persuasive the Sixth Circuit’s reasoning on this point:
 

 the retiree insurance provisions, Article XVII, Section 1, contain a promise that the company will pay an early retiree’s insurance upon such retiree reaching age 65 but that the retiree must bear the cost of company insurance until that time. Since an employee is entitled under the collective bargaining agreement to retire at 55, the company’s promise could remain outstanding for a ten-year period. If retiree insurance benefits were terminated at the end of the collective bargaining agreement’s three-year term, this promise is completely illusory for many ....
 

 Yard-Man,
 
 716 F.2d at 1481.
 

 As the court previously noted in its earlier Memorandum Opinion, “a contract is ambiguous when it is reasonably susceptible to more than one interpretation.”
 
 See Groover,
 
 187 F.R.D. at 671
 
 (citing Stewart
 
 980 F.2d at 701). Michelin’s understanding of the contract simply cannot be reconciled with the whole paragraph 6.14 on the basis of the plain language. Thus, while Michelin’s argument as to paragraphs 6.1, 6.14, and 10 might be accepted, it could only lead to one possible interpretation of the language discussed above, i.e., that it was either intentionally or mistakenly illusory. This language of paragraph 6.14 could also, however, lead to the interpretation that Michelin would not include an illusory promise of benefits. Therein lies an ambiguity to be resolved by extrinsic evidence, even accepting Michelin’s Article 6 and Article 10 analysis.
 

 3.
 
 The Court Rejects Michelin’s Plain Language Argument.
 

 Having accepted, for the sake of argument, Michelin’s contentions regarding the plain language of the P
 
 &
 
 I Agreements, the court now rejects them.
 

 Michelin argues that the court originally overlooked its contention that paragraph 6.1 “provides the critical link between the ‘shall receive’ language Plaintiffs cite in paragraph 6.14 of each P & I Agreement, and the general durational language found in each P
 
 &
 
 I Agreement,” pointing out that the court’s earlier Memorandum Opinion did not mention paragraph 6.1.
 

 Although paragraph 6.1 has always been considered by the court, the failure to mention it will be remedied now.
 

 First, paragraphs 6.1 and 6.14 treat employees and retirees separately. “Employees who retire,” etc., provided for in paragraph 6.14, could easily have been included in paragraph 6.1 following the durational provision, e.g., “... for the duration of this Agreement, the Company will provide to eligible employees and their dependents, and to employees who retire .... ” The fact that employees who retire are treated separately from eligible employees under Article 6 could suggest that the parties intended to treat them differently.
 
 See Bidlack v. Wheelabrator Corp.,
 
 993 F.2d 603 (7th Cir.) (en banc),
 
 cert. denied,
 
 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) (“The fact that the agreement specified retirees’ rights separately from those of active employees, extending to them benefits which previously had been extended to the active employees alone, suggests, though hardly demonstrates, that the collective bargaining agreements did not make the two groups march in lockstep.”)
 

 Second, Michelin’s argument that paragraph 6.1’s durational limitation of the welfare benefit plan for eligible employees must necessarily be read into “the benefits
 
 *1263
 
 described in this Article,” which paragraph 6.14 provides that employees who retire “shall receive,” is not the only possible reading of the two paragraphs together. Another possible interpretation is that, since paragraph 6.14 specifically provides that employees who retire shall receive “the benefits” described in the Article, without including limiting language such as “for the duration of this Agreement,” this evidences an intent not to so limit retiree benefits. “The benefits” may reasonably be interpreted as meaning the medical benefits provided by the plan, without necessarily having any reference to duration.
 

 Third, paragraph 6.1 says nothing about retirees, while it does describe, following the durational limitation, what the company will provide to “eligible employees and their dependents.” Considering the fact that “employee” is previously defined as a member of a “bargaining unit” and retirees are not members of bargaining units, it might be inferred that paragraph 6.1, including its durational limitation, does not refer to retirees.
 
 See
 
 Article 1, paragraph 1.2(F) of the 1991 P & I Agreement.
 

 These ambiguities cannot be resolved within the four corners of the document. While Michelin makes strong arguments as to why the Agreements should be interpreted as not vesting benefits, its interpretation is not the only reasonable one. Michelin is clearly wrong in its argument that paragraph 6.1 makes the P & I Agreement unambiguous, and the court rejects it. The court noted in its previous Memorandum Opinion, and now, for the second time, makes this finding as a matter of law: the P & I Agreements are ambiguous on the question of whether welfare benefits were intended to vest. As the Seventh Circuit observed in
 
 Bidlack,
 
 because “the contract in this case is ambiguous and both sides are poised to present testimony and documents that they claim will disambiguate it [,] .... they should be allowed to do so” at trial. 993 F.2d at 609.
 

 4.
 
 Side Letters.
 

 Michelin argues that the court erroneously concluded that the side letters involved in this case were extrinsic evidence, rather than part of the P & I Agreements or separate, negotiated contracts. From the way this issue is argued by Michelin, it appears that some clarification of the court’s earlier Opinion may be in order.
 

 The court did not hold that these side letters could not be a part of the P & I Agreements or separate, negotiated contracts. To the contrary, the court found that that was a disputed issue of fact. The court did hold, also, that the side letters and the course of dealing among the parties could constitute extrinsic evidence of the intention of the parties in regal'd to vesting of benefits.
 

 Michelin has submitted substantial evidence of negotiations between the company and the union regarding benefits to be extended to retirees under each P & I Agreement. In saying, however, that this court held that the parties stopped negotiating over retiree benefits in 1994, Michelin misreads the earlier Opinion. In that portion of the Opinion, the court was only describing the conflicting evidence before it and stylized that evidence as an “abrupt change” in the parties’ relationship. The “abrupt change” was the alleged reductions in benefits, whereas benefits had always been increased in the past.
 

 In looking at the P & I Agreements before 1994, a finding that the side letters became part of the Agreements, or were separate binding contracts, would not remove the ambiguity of the Agreements. The language of the side letters does not cure the ambiguities in the Agreements themselves so as to state unambiguously, reading an Agreement and its side letters together, that no medical benefits are vested for persons who retire during the term of that Agreement.. The fact that they were negotiated, and the fact of what they said, however, might well be considered as extrinsic evidence that the intent of the parties had always been to limit benefits to
 
 *1264
 
 retirees to the duration of the Agreements. The fact finder might also conclude, however, that as to P
 
 &
 
 I Agreements before 1994 the union merely successfully negotiated with the company to obtain during the terms of the Agreements increased medical benefits for retirees over the benefits which were vested in them under earlier Agreements.
 

 The side letters to the 1994 and 1997 P & I Agreements present an issue in addition to the matter of extrinsic evidence. That issue is whether, even if these Agreements continue to be ambiguous as to vesting, which the court holds they do, retirees are contractually bound by those side letters. Again, the court holds that that is a disputed issue of fact.
 

 In arguing that this court should hold the retirees to be bound by the 1994 and 1997 side letters, as a matter of law, Michelin overlooks, or fails to acknowledge, that there is obviously a difference between whether the union, in fact, bargained for retirees with the company and whether, in fact, the union had the authority to do so. These are two separate questions. Merely proving the former does not necessarily prove the latter. Neither does the fact that retirees willingly accepted increased medical benefits in past years necessarily prove that the union was authorized to negotiate decreased benefits for them, if that is what happened. This is another fact issue left for resolution by the jury.
 

 5.
 
 The Issues of Fact.
 

 Michelin contends that no medical benefits were vested in retirees under any of the P & I Agreements, and that without the side letters the retirees would be entitled to no medical benefits whatsoever. Since the Agreements are ambiguous, this is an issue of fact left for determination by the jury. Michelin also contends that, even if benefits were vested, the members of the class are bound by side letters which may have reduced those benefits following negotiations on their behalf. This is also a fact issue for the jury, in the event it is first determined that some benefits were vested.
 

 The Plaintiffs contend that when they retired they became vested with the right to receive the medical benefits provided by the P & I Agreement under which they retired. They also seem to suggest at times, however, that they somehow became vested with the right to receive increased benefits under side agreements entered into at various times after their retirement. This, however, is inconsistent with their contention that they are not bound by the terms of the 1994 and 1997 side agreements. They cannot have it both ways. The court has been presented with no evidence up to this point which would allow a factual determination that any benefits became vested other than the benefits provided under the Agreement in force at the time of retirement. Therefore, in the absence of the presentation of evidence of intent of which the court is unaware, any finding of vesting will be limited to the medical benefits to which each Plaintiff was entitled under the P & I Agreement in effect at the time of the Plaintiffs retirement.
 

 IV.
 
 CONCLUSION
 

 For the reasons stated above, it is hereby ORDERED that the Motion to Reconsider is DENIED.
 

 The clerk is DIRECTED to serve copies of this Memorandum Opinion and Order by facsimile.
 

 ORDER
 

 This cause is before the court on the Defendant’s Motion to Decertify the conditionally certified class in this action.
 
 See Groover v. Michelin North America, Inc.
 
 187 F.R.D. 662 (M.D.Ala.1999). It is hereby ORDERED that the Motion to Decertify is DENIED. A Memorandum Opinion will follow.
 

 
 *1265
 
 The clerk of the court is DIRECTED to serve copies of this Order on the attorneys for the parties by facsimile transmission.
 

 [1]
 

 . The parties, apparently, disagree as to whether the changes actually lowered existing welfare benefits.
 
 See Pl.Resp.Br.
 
 at 12. Neither Michelin nor Plaintiffs have pointed out any evidence to the court as to the economic effect of these changes.
 

 [2]
 

 .
 
 See
 
 July 15, 1967 Goodrich P & I, at 32-33; June 13, 1970 Goodrich P & I, at 36-37; Sept. 6, 1976 Goodrich P & I, at 59; April 21, 1979 Goodrich P & I, at 64; Apr. 21, 1985 Goodrich P & I, at 70; Apr. 28, 1988 Uniroyal Goodyear P & I, at 173.
 

 [3]
 

 . Michelin argues as follows:
 

 Notably, Plaintiffs ignore the "for the duration of this Agreement/during the life of this Agreement language” found in
 
 every
 
 article of every CBA that addresses medical benefits. Numerous courts have made clear that such language cannot be ignored.
 

 Def.Resp.Br.
 
 at 30. Michelin, however, cites the court to no authority actually holding that such language requires a finding in favor of the company. Such language is included in all portions of the agreement
 
 except
 
 tha1 dealing with retiree benefits. Although such a situation might exist, the court cannot conceive of one where limiting all rights but one would manifest, a clear intent to limit the one not so limited.
 

 [4]
 

 . This argument is an example of the doctrine of
 
 expressio unius est exclusio alterius,
 
 which instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded.
 
 Int'l Union of District 50
 
 v.
 
 Bowman Transportation, Inc.,
 
 421 F.2d 934, 935 (5th Cir. 1970). This concept has been applied by the Eleventh Circuit to collective bargaining agreements.
 
 Plumbers and Steamfitters Local No. 150 Pension Fund v. Vertex Construction Co., Inc.,
 
 932 F.2d 1443 (11th Cir.1991).
 

 [5]
 

 . After the Motions for Summary Judgment were taken under submission, the Plaintiffs filed a Motion to Supplement. In that Motion, the Plaintiffs sought to supplement the record on summary judgment with additional extrinsic evidence. Because the court does not consider the extrinsic evidence in this case to resolve the ambiguity inherent in the Agreements, the Plaintiffs’ Motion to Supplement is due to be DENIED.
 

 [6]
 

 . Again, Plaintiffs dispute the legal effect of such a unilateral commitment by the company.
 

 [7]
 

 . Michelin has also claimed that retirees should be estopped from claiming that their benefits were vested under the P & I Agreements, because they accepted the increases afforded them by operation of side letter extensions issued concomitant with the renegotiation of each successive P & I Agreement. The court fails to see, nor has Michelin explained, how the elements of estoppel, particularly Michelin’s detrimental reliance, are satisfied on the facts of the case. This confusion is compounded by the fact that Michelin has not cited to any precedent for this proposition.
 

 In response. Plaintiffs have offered an interpretation of the course of performance evidence that construes it to be a "novation” in which parties substituted performance for certain obligations. Because the court does not accept Michelin’s estoppel claim, it does
 
 *1251
 
 not address Plaintiffs novation argument, which suffers from serious infirmities of its own.
 

 [1]
 

 . Assuming that, as Michelin argues, the court did not assign enough weight to paragraph 6.1, such an error would be harmless (for the reasons discussed below) and technically should be disregarded under Federal Rule of Civil Procedure 61. However, the court will endeavor to satisfy Micheliris request.
 

 [2]
 

 . The court does not hold that this is the case, it is merely assuming it to be the case.